**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**RAEKWON MALIK HARROD,**<br><br>**Defendant.** | **Crim. Case No. 23-445-ACR** |

## UNITED STATES' MEMORANDUM IN AID OF SENTENCING

Defendant Raekwon Malik Harrod actively participated in a scheme that caused one American company to lose more than $900,000. He repeatedly decided to steal from that company by fraudulently using its UPS account to print shipping labels that he and another conspirator sold online. He only stopped stealing from that organization when the UPS login credentials stopped working. Instead of ceasing his criminal conduct, he managed to fraudulently obtain access to a second company's UPS account. The FBI interviewed him about his criminal conduct in July 2022. After that interview, it appears as though he continued to sell UPS labels for a couple of months. The government respectfully requests that the Court sentence Harrod to 18 months' imprisonment—the bottom of the recommended U.S. Sentencing Guidelines range—followed by three years of supervised release. Such a sentence would be sufficient but not greater than necessary to achieve the purposes of sentencing.

### I.    Background

Harrod was raised by supportive parents who provided him with a childhood that he described as being "chill" and free of abuse.  PSR ¶ 78-79. Despite witnessing multiple shootings as a kid, he said he always "swayed towards the positive." PSR ¶ 79.  He graduated from a local

1

D.C. high school in 2017 in the top forty percent of his class. PSR ¶ 96. He briefly attended college in Delaware. PSR ¶ 94, 96. His family continues to be supportive of him. PSR ¶ 81-82.

Towards the end of 2020, Harrod received access to Victim Organization One's UPS account. Carl Granada Wilson, Jr. provided him with the compromised account's log-in credentials, and Harrod provided them to Khalil Cooper. PSR ¶ 24. At first, Harrod and Cooper, who both re-sold shoes online, used the account to create UPS shipping labels to ship shoes that they sold, which reduced their shipping costs to zero. PSR ¶ 25. Cooper then suggested that he and Harrod use the account to sell UPS shipping labels to third parties. PSR ¶ 26. Harrod readily agreed and the two proceeded to advertise their new service online. They promoted their illegal business on Discord and sold labels at prices that ranged from approximately half to significantly less than half of retail UPS prices. PSR ¶ 27.

During the course of their conspiracy to defraud Victim Organization One, Cooper and Harrod each created thousands of UPS labels using Victim Organization One's account. PSR ¶ 29. As a result, they caused Victim Organization One to lose at least $920,000. PSR ¶ 40. There is no doubt that they would have kept stealing from Victim Organization One if they could have. The only reason they stopped is because their login credentials ceased working. *See* PSR ¶ 30, 32.

After they lost access to Victim Organization One's UPS account, Harrod and Cooper worked with Wilson to gain access to Victim Organization Two's UPS account. PSR ¶ 41-42. The three men then embarked on a criminal journey that involved Harrod and Cooper continuing to advertise labels online. *See generally* PSR 41-48.

On July 19, 2022, the FBI went to Harrod's Washington, D.C., residence hoping to interview him about the scheme. Harrod spoke with the agents and confirmed that he understood he was stealing the shipping labels that he sold. He also said he would stop. In April 2023, the FBI

returned to Harrod's residence to give him a target letter. During that meeting, Harrod noted that he had not sold any additional UPS labels after the FBI approached him in July 2022.

Between July 20, 2022, and September 20, 2022, Zelle records show Harrod receiving 168 transfers totaling more than $39,550. The overwhelming majority of those transfers did not contain information in the "payment memo" section. However, 17 of the 168 transactions included one of the following three descriptions in the payment memo section: "UPS Shipping Labels," "Labels," or "Invoice for Labels." Those 17 transactions took place between July 25, 2022, just days after the FBI originally interviewed Harrod, and September 19, 2022, and totaled $11,341. Thus, the transactions certainly call into question Harrod's assertion that he did not sell any labels after the FBI approached him on July 19, 2022.

On January 5, 2024, Harrod pleaded guilty to one count of conspiracy to commit mail fraud, in violation of 18 U.S.C. § 371, a five-year statutory maximum offense, which has a base offense level of 6. USSG § 2B1.1(a)(2). The conduct set forth in his Statement of Offense, ECF No. 6, also would have supported a conspiracy to commit mail fraud conviction under 18 U.S.C. § 1349, which is a twenty-year statutory maximum offense and carries a base offense level of 7. USSG § 2B1.1(a)(1).

## II.    Sentencing Guidelines

The parties and the presentence investigation report writer agree that the following guidelines apply.

| USSG § 2X1.1(c)(1) / 2B1.1(a)(2) | Base Offense Level | 6 |
| USSG § 2B1.1(b)(1)(H) | Loss Amount: $550,001 - $1,500,000 | 14 |
| USSG § 3E1.1 | Acceptance of Responsibility | -3 |
| USSG § 4C1.1 | Zero-Point Offender Adjustment | -2 |

PSR ¶ 6-7; 59-60, 66-68. The defendant is in Criminal History Category I. PSR ¶ 72. Accordingly, based on a total offense level of 15 and CHC I, the parties agree that the guidelines recommend a sentence of 18 to 24 months' imprisonment and a fine of $7,500 to $75,000.  USSG, Ch. 5, Pt. A; USSG § 5E1.2(c)(3).[1]

### III.     The 18 U.S.C. § 3553(a) Factors

The Court must impose a sentence that is sufficient but not greater than necessary to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational treatment. 18 U.S.C. § 3553(a)(2). The Court also must consider the history and characteristics of the defendant, the kinds of sentences available, the sentencing range under the guidelines, any relevant policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to the victims. 18 U.S.C. § 3553(a)(1)-(7).

### A.  The Nature and Circumstances of the Offense and the Need for the Sentence to Reflect the Seriousness of the Offense

The defendant's fraud was extensive and serious. His criminal conduct was not limited to just one day, one week, or even one year. On the contrary, he actively participated in a scheme to defraud two American corporations. He personally created thousands of fraudulent shipping labels during the scheme. Moreover, it appears that he continued to sell shipping labels even after the FBI confronted him about the scheme. A sentence at the bottom of the U.S. Sentencing Guidelines would properly reflect the seriousness of the offense.

---

[1]  The Draft PSR recommended a two-level mass-marketing adjustment under USSG § 2B1.1(b)(2)(A)(ii). The government and the defense both objected to the application of that adjustment. *See, e.g.,* ECF No. 14 (Gov't Response to Presentence Report).

**B.  The Need to Promote Respect for the Law and to Deter the Defendant and Others from This Type of Criminal Conduct**

The defendant's fraudulent use of corporate UPS accounts allowed him to make a significant amount of money quickly with minimal effort. He and Cooper simply advertised UPS labels on Discord, created labels once customers submitted orders, and transmitted the labels to customers. Given the ease in which they made money, a within-guidelines sentence is necessary to promote respect for the law and deter other would-be fraudsters from pursuing the same path that Harrod and Cooper did.

**C.  The History and Circumstances of the Defendant**

Harrod's upbringing was far from perfect. Although he described his childhood as being "chill," he witnessed several shootings and "saw a lot" growing up. PSR ¶ 79. He is fortunate, however, that he never was abused and had two loving parents who continue to support him to this day. PSR ¶ 81-82.

Although his father described him as someone who "made a mistake" with the offense being atypical behavior, PSR ¶ 82, Harrod engaged in this criminal conduct over and over and over again for a long period of time. He did not stop stealing from Victim Organization One or Victim Organization Two out of the goodness of his heart or because he felt bad about his criminal conduct. He only stopped stealing from the first victim because the account login stopped working. Even then, because he was completely committed to the criminal conduct, Harrod and Cooper actually brainstormed ways to regain access to the account. PSR ¶ 32. When doing so proved infeasible, they simply moved on to another company's UPS account and started using it to facilitate their fraud scheme.

Given the defendant's history and circumstances, the government submits that a sentence at the bottom of the guidelines is appropriate.

**D. Unwarranted Sentencing Disparities**

The District of Columbia Circuit has recognized that there will "inevitably . . . [be] sentencing disparities and inequities that can be explained by little more than the identities of the sentencing judges." *United States v. Gardellini*, 545 F.3d 1089, 1096 (D.C. Cir. 2008); *see also United States v. Saez*, 444 F.3d 15, 19 (1st Cir. 2006) ("[W]ith different judges sentencing two defendants quite differently, there is no more reason to think that the first one was right than the second."). The Guidelines "reduce unwarranted federal sentencing disparities," *Freeman v. United States*, 564 U.S. 522, 525 (2011), by "creat[ing] a comprehensive sentencing scheme in which those who commit crimes of similar severity under similar conditions receive similar sentences." *Id.* at 533.

A sentencing court "necessarily g[ives] significant weight and consideration to the need to avoid unwarranted disparities" by "correctly calculat[ing] and carefully review[ing] the Guidelines range." *Gall v. United States*, 552 U.S. 38, 54 (2007). "[I]mposing a within-guidelines sentence is the surest way to avoid unwarranted disparities." *United States v. White*, 737 F.3d 1121, 1145 (7th Cir. 2013).[2]

---

[2] According to the U.S. Sentencing Commission's Judiciary Sentencing Information (JSIN), "During the last five fiscal years (FY2019-2023), there were 526 defendants whose primary guideline was §2B1.1, with a Final Offense Level of 15 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 350 defendants (67%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 12 month(s) and the median length of imprisonment imposed was 12 month(s). For all 526 defendants in the cell, the average sentence imposed was 10 month(s) and the median sentence imposed was 12 month(s)." The Commission notes, "The sentencing data provided does not reflect the Commission's recommendation regarding the appropriate sentence to be imposed or represent the Commission's official position on any issue or case. Nor does the information provided reflect the Commission's position regarding the weight to be given, if any, to the above sentencing information in a court's determination of the appropriate sentence to be imposed." *See* https://jsin.ussc.gov/analytics/saw.dll?Dashboard (Primary Guidelines §2B1.1, CHC I / 18-24) (last visited June 18, 2024).

## IV.     Restitution and Forfeiture

The government requests that the Court order the defendant to pay restitution to Victim Organization One in the amount of $920,000, for which Harrod should be jointly and severally liable with his coconspirators.[3]

The government also requests that the Court orally reference the consent order of forfeiture—a $384,871 money judgment—at sentencing and include the order in the judgment. ECF No. 10.

## **CONCLUSION**

The government requests that the Court sentence defendant Raekwon Malik Harrod to 18 months in prison followed by three years of supervised release.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:     _/s/ Kondi J. Kleinman_
KONDI J. KLEINMAN
California Bar No. 241277
Assistant United States Attorney
Fraud, Public Corruption & Civil Rights Section
601 D Street, N.W. | Washington, D.C. 20530
(202) 252-6887 | Kondi.Kleinman2@usdoj.gov

---

[3] The government will supplement this memorandum with restitution information for Victim Organization Two upon receipt of such information.